# EXHIBIT 1

AO88 (Rev. 12/07) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

District of Colorado

In re:
REMBRANDT TECHNOLOGIES, LP
PATENT LITIGATION

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] MDL No. 07-md-1848 (GMS)

Pending in the District of Delaware

TO: Cable Television Laboratories, Inc.
c/o Mary Sooter, Esq., Faegre & Benson
1900 Fifteenth Street
Boulder, CO 80302

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☑ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Hotel Boulderado, 2115 13th Street, Boulder, CO 80302, or at a location agreed to by the parties, consistent with Federal Rule of Civil Procedure 45; see Exhibit A, attached hereto. | 4/8/2009 9:00 am |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit B, attached hereto.

| PLACE | DATE AND TIME |
|---|---|
| Hotel Boulderado, 2115 13th Street, Boulder, CO 80302, or at a location agreed to by the parties, consistent with Federal Rule of Civil Procedure 45. | 4/8/2009 9:00 am |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| [signature] Attorney for Plaintiff Rembrandt Technologies, LP | 4/1/2009 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Kevin B. Huff, Esq., Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C.
1615 M Street, N.W., Suite 400, Washington, D.C. 20036, (202) 326-7900

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ______________________ ______________________

DATE SIGNATURE OF SERVER

______________________

ADDRESS OF SERVER

______________________

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) Protecting a Person Subject to a Subpoena.**

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena.

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.**

The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**EXHIBIT A**

**ATTACHED TO REMBRANDT'S SUBPOENA TO CABLE TELEVISION LABORATORIES, INC.**

**INSTRUCTIONS**

This subpoena calls for Cable Television Laboratories, Inc. ("you" or "CableLabs") to designate and make available for the purpose of giving testimony at deposition one or more officers directors, managing agents, employees, or other sufficiently knowledgeable persons who consents to testify on your behalf with respect to each of the matters set forth below, and the person(s) so designated shall be required to testify as to each of those matters known or reasonably available to you.

The deposition will take place beginning at 9 a.m., at the Hotel Boulderado, 2115 13th Street, Boulder, Colorado 80302 on April 8, 2009, or at a location and time agreed to by counsel for the parties, consistent with Federal Rule of Civil Procedure 45. The deposition will be taken pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and Rule 30 of the Court's Local Rules before an officer and reporter authorized to administer oaths. The deposition will be videotaped and recorded by stenographic means.

**DEFINITIONS**

The following definitions apply to this Notice of Deposition and are deemed to be incorporated into each subject listed below:

1. The phrase "relating to" means discussing, describing, referring to, pertaining to, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, or concerning, in whole or in part.

2. The term "document" or "documents" is used in the broadest sense permitted by the Federal Rules of Civil Procedure and means the original (or any copy when originals are not

available) and any drafts or non-identical copies thereof, whether different from the original because of interlineation, receipt stamp, notation of copy sent or received or otherwise, of any book, pamphlet, periodical, letter, report, note, memorandum, record, minutes, calendar or diary entry, transcript, study, compilation, patent, patent application, analysis, tabulation, map, diagram, drawing, plan, picture, summary, working paper, chart, paper, graph index, data sheet, data processing card, computer printout, summary of a computer printout, tape, contract, agreement, lease, ledger, journal, balance sheet, account, invoice, purchase order, receipt, billing record, financial data, financial statement, file, diary, film, trip tickets, telex, teletype or other messages, telegram, expense vouchers, instructions, bulletins or any other writing or recording of information, however produced, recorded, maintained or reproduced, including any electronic or mechanical recording of any oral material, within the possession, custody or control of CableLabs or any of its officers, directors, employees, attorneys, or other agents and/or representatives. The term "document" encompasses electronically stored information, including without limitation electronic files in their native format stores with any associated metadata.

3. The term "including" shall mean including but not limited to.

4. The term "person" means natural person, corporation, firm, company, sole proprietorship, partnership, joint venture, association, institute, or other business, legal or governmental entity or association, including any directors, officers, employees, agents or representatives thereof.

5. The term "communication" (or any variant thereof) means any contact between or among two or more persons and shall include, without limitation, written contact by means such as letters, memoranda, telegrams, telecopies, telexes, e-mail, or any other document; the

transmittal of information by any means; any oral contact such as face-to-face meetings or telephone conversations; and any writings memorializing such oral contact.

6. “Thing” means any tangible object other than a document including, without limitation, objects of every kind and nature, as well as prototypes, models, drafts, or specimens thereof.

7. “CableLabs,” “you,” or “your” mean and include Cable Television Laboratories, Inc. and its agents, subsidiaries, related entities, affiliated companies, predecessors, successors, assigns, officers, directors, partners, employees, representatives (in their individual or representative capacities), committee members, affiliates of any kind or nature, or any person or entity acting on their behalf.

8. The terms “Multiple Systems Operator(s)” and “MSO Defendant(s)” mean and include the following entities and their subsidiaries, affiliates, divisions, successors or assignees, and their respective officers, directors, employees, and agents: Comcast Corporation; Comcast Cable Communications, LLC; Comcast Cable Communications Holdings, Inc.; Comcast of Plano, LP; Time Warner Cable, Inc.; Time Warner Cable, LLC; Time Warner New York Cable, LLC; Time Warner Entertainment Company, LP; Time Warner Entertainment-Advance/Newhouse Partnership; Charter Communications, Inc.; Charter Communications Operating, LLC; Coxcom, Inc.; Cablevision System Corporation; CSC Holdings, Inc.; Adelphia Communications Corporation; Century-TCI California Communications, LP; Century-TCI Holdings, LLC; Comcast of Florida/Pennsylvania, LP (f/k/ka Parnassos, LP), Comcast of Pennsylvania II, LP (formerly Century-TCI California, LP), Parnassos Communications, LP; Adelphia Consolidation, LLC; Parnassos Holdings, LLC; and Western NY Cablevision, LP.

9. The terms "Cable Equipment Vendor(s)" and "Equipment Vendor Defendant(s)" mean and include the following entities and their subsidiaries, affiliates, divisions, successors or assignees, and their respective officers, directors, employees, and agents: Motorola, Inc., Cisco Systems, Inc., Scientific-Atlanta, Inc., ARRIS Group, Inc., Thomson, Inc., Ambit Microsystems, Inc., and NETGEAR, Inc.

10. As used herein, "the Defendant(s)" means the following entities and their subsidiaries, affiliates, divisions, successors or assignees, and their respective officers, directors, employees, and agents: Time Warner Cable, Inc., Time Warner Cable LLC, Time Warner New York Cable LLC, Time Warner Entertainment Company, LP, Time Warner Entertainment–Advance/Newhouse Partnership, Comcast Corporation, Comcast Cable Communications, LLC, Charter Communications, Inc., Charter Communications Operating, LLC, Coxcom, Inc., CSC Holdings, Inc., Cablevision Systems Corporation, Adelphia Communications Corporation, Century-TCI California, LP, Century-TCI California Communications, LP, Century-TCI Holdings, LLC, Parnassos, LP, Parnassos Communications, LP, Adelphia Consolidation, LLC, Parnassos Holdings, LLC, Western NY Cablevision, LP, Motorola, Inc., Cisco Systems, Inc., Scientific-Atlanta, Inc., ARRIS Group, Inc., Thomson, Inc., Ambit Microsystems, Inc., and NETGEAR, Inc.

11. The terms "and" and "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of these requests all documents which might otherwise be construed to be outside their scope.

12. The term "all" shall mean any and all, and the term "any" shall mean any and all, unless the context clearly requires otherwise.

13. References to the singular shall include the plural, and references to the plural shall include the singular as may be appropriate or construe the individual document requests in the broadest form.

14. The masculine form of a noun or pronoun shall be considered to include within its meaning the feminine form of the noun or pronoun, and vice versa as may be appropriate to make the individual document requests inclusive rather than exclusive.

15. Any reference to any individual person, either singularly or as a part of a defined group, includes that individual person's employees, agents, successors, assignees, heirs, and representatives.

16. The term "Patents-in-Suit" shall mean United States patents numbers: 6,131,159 ("the '159 patent"); 5,710,761 ("the '761 patent"); 5,778,234 ("the '234 patent"); 6,950,444 ("the '444 patent"); and 5,008,903 ("the '903 patent") except as to any patents to which the parties stipulate or the Court orders the claims be dismissed.

17. The term "cable industry" shall mean entities, including the MSO Defendants, that provide "cable services" within the meaning of 47 U.S.C. § 522(6) or that provide to such entities information, products, or services related to the provision of cable services within the meaning of 47 U.S.C. § 522(6).

18. The term "modem" shall refer to a cable modem or cable modem termination system.

19. The term "CMTS device" shall refer to a cable modem termination system.

20. The term "DOCSIS" shall refer to the commonly known industry specifications referred to as DOCSIS 1.0, DOCSIS 1.1, DOCSIS 2.0, and DOCSIS 3.0, and any predecessor

projects or initiatives involving CableLabs or Multimedia Cable Network System ("MCNS") that became part of DOCSIS.

21. "DOCSIS RFI Specification 1.0" shall mean the DOCSIS Radio Frequency Interface (RFI) 1.0.

22. "DOCSIS RFI Specification 1.1" shall mean the DOCSIS Radio Frequency Interface (RFI) 1.1.

23. "DOCSIS RFI Specification 2.0" shall mean the DOCSIS Radio Frequency Interface (RFI) 2.0.

24. "DOCSIS Specification 3.0" shall mean the DOCSIS 3.0 Physical Layer Specification and the DOCSIS 3.0 Media Access Control ("MAC") and Upper Layer Protocols Interface Specification.

25. The "DOCSIS Specifications" shall mean the DOCSIS RFI Specifications 1.0, 1.1, 2.0, and DOCSIS Specification 3.0.

26. The term "DOCSIS-Compliant" means DOCSIS Certified or Qualified or Re-Certified or Re-Qualified.

27. The term "DOCSIS Certification" means and includes DOCSIS certification, qualification, and/or recertification.

28. The term "DOCSIS-Compliant Devices" means and includes any modem that has been: (i) certified, qualified, or recertified as complying with any of the DOCSIS Specifications; and (ii) manufactured, sold, leased, or otherwise offered for sale by any Equipment Vendor Defendant, or purchased, leased, or otherwise used by any MSO Defendant.

29. The term "software" shall refer to any and all forms, including object code and source code, of the following: (i) computer programs and procedures, including without

limitation, system software (e.g., operating systems, device drivers, diagnostic tools, servers, windowing systems, utilities and the like), middleware, programming software (e.g., editors, compilers, interpreters, linkers, debuggers, and the like), and application software, (ii) software libraries, tables and databases, and (iii) any other computer code or instruction that is read, used, compiled or executed using hardware; in each case including, without limitation, the programmable content of a hardware device (e.g., firmware, FPGA personality).

30. The term "cable modem operating software" shall have the same meaning as it does in DOCSIS 2.0, section 12.1.

31. The term "cable modem operating software" shall have the same meaning as it does in DOCSIS 2.0, section 12.1.

32. The term "documentation" means engineering documentation or software documentation that describes the structure, components, and/or operation of hardware, software, and/or a chip.

33. The terms "portion of the software" and "portions of the software" mean functions, routines, subroutines, libraries, blocks of source code, and/or kits.

34. The term "Range-Request (RNG-REQ)" shall have the meaning given in the DOCSIS Specifications.

35. The term "Range-Response (RNG-RSP)" shall have the meaning given in the DOCSIS Specifications.

36. The term "Upstream Channel Descriptor (UCD)" shall have the meaning given in the DOCSIS Specifications.

37. The term "DOCSIS Preamble" shall mean a "preamble" as described in the DOCSIS Specifications.

38. The term "DOCSIS Patent Pool" shall mean all patent(s) ever licensed to CableLabs pursuant to any version of the DOCSIS License Agreement.

## TOPICS FOR EXAMINATION

1. Communications between you and the Defendants regarding the type of service, features, or functionality desired in cable modems and CMTS devices.

2. Your understanding of any patents granted, provided, or licensed to you relating to DOCSIS.

3. Any of your licenses (whether as licensee or licensor) or agreements pertaining to intellectual property, including the licenses themselves and their terms.

4. Communications between you and AT&T Broadband, AT&T, or AT&T Inc. regarding licensing patents related to DOCSIS.

5. Any membership fees, capital infusions, or other contributions made to you by each of the MSO Defendants, and the basis or bases on which such contributions were calculated.

6. The projected and actual costs associated with modifying the design of cable modems and CMTS devices and/or updating and modifying deployed cable modems and CMTS devices to be compliant with each successive version of DOCSIS.

7. The existence, identity, content, and interpretation of documents sufficient to show the budget(s) and actual costs associated with the development of DOCSIS and or modifying or revising cable modems, CMTS devices, and other equipment in response to each successive version of DOCSIS.

8. The existence, identity, content, and interpretation of documents sufficient to show your understanding of all costs associated with the following:

   a. Researching, developing, implementing, and selling each version of DOCSIS Compliant Devices, broken down by category as those costs are tracked in the ordinary course of business (e.g., manufacturing costs; sales,

general, and administrative costs; fixed costs; variable costs; direct costs; indirect (or allocated) costs, etc.), for each year since January 1, 1999;

b. The costs charged by CableLabs to test and certify whether cable modems are DOCSIS compliant, as well as CableLabs' actual costs in doing so, for each year since January 1, 1999; and

c. Changing, modifying, or updating cable modems, CMTS devices, and other equipment in response to each successive version of DOCSIS, for each year since January 1, 1994.

9. The DOCSIS Patent Pool, including:

a. its compilation;

b. patents that are included;

c. the decision to make it royalty-free;

d. alternatives to the royalty-free arrangement that were considered;

e. communications, whether to or from CableLabs, whether internal or external, whether in writing or oral, about the DOCSIS patent pool;

f. the coverage of the DOCSIS patent pool (e.g., whether it covers only that which is essential for DOCSIS, or whether it also covers the implementation of DOCSIS);

g. representations made by CableLabs to CableLabs members, DOCSIS patent pool members, and other third parties about the DOCSIS patent pool;

h. how CableLabs maintains the DOCSIS patent pool (i.e., the compilation of additional patent rights for newer versions of DOCSIS or for newly discovered patents that are necessary for DOCSIS);

i. the parties to the DOCSIS patent pool; and

j. Communications regarding the DOCSIS Patent Pool between you and any persons who did not join or contribute intellectual property to the DOCSIS Patent Pool.

10. The DOCSIS License Agreement, including:

a. the process of drafting the Agreement;

b. the parties who drafted the Agreement;

c. CableLabs' understanding of the meaning of the Agreement;

d. communications, whether to or from CableLabs, whether internal or external, whether in writing or oral, about the meaning of the DOCSIS License Agreement, the circumstances surrounding its negotiation and adoption, and the vendor-authors and signatories of the DOCSIS License Agreement;

e. any changes that have been made to the Agreement over time;

f. the disclaimers that are included in the Agreement; and

g. parties that have signed the Agreement.

11. The Instructions for DOCSIS License Agreement[1], including:

a. the process of drafting the Instructions;

b. who drafted the Instructions;

c. CableLabs' understanding of the Instructions;

d. communications, whether to or from Cablelabs, whether internal or external, whether in writing or oral, about the Instructions;

e. changes to the Instructions over time; and

f. distribution of the Instructions.

12. The creation of the DOCSIS Specifications, including:

a. the process of drafting the Specifications;

b. who drafted the Specifications; and

c. how CableLabs made known to third parties the drafting of the Specifications.

13. The process, including specific steps and the time necessary to complete each step, by which CableLabs

[1] *See* CBLLAB 000843.

a. tests, certifies, evaluates or fails to certify cable modems for DOCSIS compatibility or compliance; and

b. tests, evaluates, qualifies or fails to qualify CMTS devices for DOCSIS compatibility or compliance.

14. Identification of all cable modems and CMTS devices by manufacturer or vendor – including the identification of the version of software or firmware running on those cable modems or CMTS devices – submitted by Defendants, used by Defendants, or submitted by Defendants' suppliers, vendors, or manufacturers that CableLabs

a. tested, certified, qualified or failed separately for DOCSIS 1.1, DOCSIS 2.0, and DOCSIS 3.0; and

b. to the extent certified (in the case of cable modems) or qualified (in the case of CMTS devices), when certifications or qualifications were issued.

15. Typical documentation produced or received by CableLabs while conducting the testing, including documents produced or received in anticipation of testing or produced or received as the result of such testing. The witness is asked to bring and explain an exemplar of such documents.

16. The development of the DOCSIS specifications, including:

a. the process by which CableLabs created each version of DOCSIS;

b. the reasons for developing each version of DOCSIS;

c. the factors considered when deciding to develop each version of DOCSIS;

d. the participation by the Defendants in the development of each version of DOCSIS;

e. the reasons for selecting the following specifications:

i. DOCSIS 1.1 sections 9.2, 10;

ii. DOCSIS 2.0 sections 4.31, 4.32, 4.5, 6.2.3, 6.2.4, 6.2.9, 6.2.13, 6.2.15, 8.3.3, 11.2.2;

iii. DOCSIS 2.0 Tables 4-1, 4-2, 8-39, 8-40;

iv. DOCSIS 2.0 Figures 4-1, 6-1, 6-2, 6-24;

v. DOCSIS 3.0 sections 10.2, 12:

f. the technology or specifications that were considered as alternatives for the following specifications:

i. DOCSIS 1.1 sections 9.2, 10;

ii. DOCSIS 2.0 sections 4.31, 4.32, 4.5, 6.2.3, 6.2.4, 6.2.9, 6.2.13, 6.2.15, 8.3.3, 11.2.2;

iii. DOCSIS 2.0 Tables 4-1, 4-2, 8-39, 8-40;

iv. DOCSIS 2.0 Figures 4-1, 6-1, 6-2, 6-24;

v. DOCSIS 3.0 sections 10.2, 12;

g. delays in the development of each version of DOCSIS, and the reason for those delays; and

h. all costs associated with delays in the development of each version of DOCSIS.

17. The number of employees at CableLabs working on DOCSIS each year from 1999 to the present, and the content, existence or identity of documents sufficient to show

a. Rosters of CableLabs or Defendant employees working on DOCSIS;

b. The frequency and duration of meetings;

c. Defendant employees visiting CableLabs (and all executed Visiting/Contributing Engineer Program Forms); and

d. The cost of those employees to CableLabs or its members.

18. CableLabs' estimates or actual data related to upstream and downstream bandwidth constraints for MSOs (and all data on a monthly basis CableLabs has related to those estimates).

19. All communications and meetings between or among CableLabs employees, engineers, representatives, or contractors, and representatives of the Defendants regarding the following sections of DOCSIS:

a. DOCSIS 1.1 sections 9.2, 10;

b. DOCSIS 2.0 sections 4.31, 4.32, 4.5, 6.2.3, 6.2.4, 6.2.9, 6.2.13, 6.2.15, 8.3.3, 11.2.2;

c. DOCSIS 2.0 Tables 4-1, 4-2, 8-39, 8-40;

d. DOCSIS 2.0 Figures 4-1, 6-1, 6-2, 6-24; and

e. DOCSIS 3.0 sections 10.2, 12.

20. The author, origin, drafting and revision of the sections, figures, and tables listed in Topic 19.

21. Which sections, figures and tables listed in Topic 19 a cable modem or CMTS device must comply with in order to be certified or qualified by CableLabs.

22. For each cable modem identified in Topic 14, CableLabs' knowledge and understanding of

a. Initialization, boot-up, and/or start-up processes of those cable modems;

b. Decompression and/or execution of software during initialization, boot-up, and/or start-up of those cable modems;

c. Memory usage of those cable modems, including memory usage during initialization, boot-up, and/or start-up of the cable modems;

d. Downloading cable modem operating software to or updating or replacing cable modem operating software in those cable modems;

e. Reprogramming those cable modems via a software download, such as a download of cable modem operating software, over a network;

f. Storage and selection of operating software in those cable modems, including the location where and the manner in which said operating software is stored in those cable modems;

g. Registration of those cable modems with a CMTS device, including:

   i. scanning of those cable modem for valid downstream channels and acquisition thereof;

   ii. processing and selection by those cable modem of upstream channels;

   iii. acquisition and processing by the cable modem of those Upstream Channel Descriptors (UCDs), including the cable modem's analysis and processing of UCDs, including extraction of parameters from a UCD;

   iv. negotiation of physical-layer parameters carried between those cable modem and the CMTS device, those parameters including but not limited to modulation, modulation rate, and center frequency;

   v. selection of error control and/or error correction parameters;

   vi. receipt and/or processing and/or analysis and/or use by the cable modems of DOCSIS Preambles or preamble bit patterns received from a CMTS device;

   vii. establishment of upstream connection, including setting of modulation and error correction; and

   viii. process or registration failure;

h. processing and generation of Range-Request (RNG-REQ) messages;

i. receipt and processing of range-response (RNG-RSP) messages;

j. obtaining equalizer/equalization coefficients for upstream cable modem transmissions;

k. adjustment of equalizer for upstream cable modem transmissions;

l. convolution algorithm used for Equalization Adjust for upstream cable modem transmissions;

m. number of taps in the equalizer for upstream cable modem transmissions;

n. extraction of Power Level Adjust information for upstream cable modem transmissions;

o. adjustment of transmission power for upstream cable modem transmissions;

p. Format of the Physical Media Dependent (PMD) frame for upstream cable modem transmissions;

q. Adding or prepending a preamble to the PMD frame for upstream cable modem transmissions, including:

i. the modulation for the preamble;

ii. the encoding rate for the preamble for upstream cable modem transmissions;

iii. the transmission power for the preamble for upstream cable modem transmissions; and

iv. Negotiation of the physical layer of a data connection between the cable modem and a CMTS device, including the devices, steps, and functionalities involved in that negotiation.

23. For each cable modem identified in Topic 14, CableLabs' knowledge and understanding of

a. The configuration of upstream channels for those CMTS devices, including:

i. generation and processing of Upstream Channel Descriptors (UCDs) by the CMTS devices;

ii. selection of modulation types to be included in the UCDs by the CMTS devices;

iii. determination, generation, and selection of DOCSIS Preambles and/or preamble bit patterns for use by the CMTS devices;

iv. generation and selection of DOCSIS Preambles and/or preamble bit patterns by the CMTS devices;

v. generation and/or selection by the CMTS devices of DOCSIS Preambles modulation;

vi. selection of error control formats to be included in the UCDs by the CMTS devices, including selection of error correction parameters;

vii. ranges of parameters in the UCD and reasons for the ranges of parameters;

b. registration of cable modems with each of those CMTS devices;

c. receipt and processing of Range-Request (RNG-REQ) messages by those CMTS devices;

d. processing and/or analysis of noise including the use of a Fourier transform or other mechanism to convert noise signals from a time domain to a frequency domain by those CMTS devices;

e. generation by those CMTS devices of Range-Response (RNG-RSP) messages, including generation and transmission of equalization information in such range-response messages;

f. receipt and processing of upstream transmissions by those CMTS devices, including receipt, processing and/or analysis of DOCSIS Preambles received from cable modems; and

g. sending of messages that initiate a remote update of any cable modem software, including information contained within such messages and the source of any such information.

# EXHIBIT B

## ATTACHED TO REMBRANDT'S
## SUBPOENA TO CABLE TELEVISION LABORATORIES, INC.

## DOCUMENT REQUEST

1. All documents and things considered, reviewed, or prepared by you in the course of preparing for the 30(b)(6) deposition on the subjects listed above in Exhibit A.